## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| SILVER CINEMAS ACQUISITION CO. DBA LANDMARK THEATRES,<br><br>    Plaintiff,<br><br>  v.<br><br>REGAL ENTERTAINMENT GROUP; REGAL ENTERTAINMENT HOLDINGS, INC.; REGAL ENTERTAINMENT HOLDINGS II, LLC; REGAL CINEMAS CORPORATION; REGAL CINEMAS HOLDINGS, INC.; REGAL CINEMAS, INC.; REGAL CINEMAS II, LLC; and REGAL GALLERY PLACE LLC,<br><br>    Defendant. | Civil Action No. 1:16-cv-123<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

1.      Plaintiff Silver Cinemas Acquisition Co. dba Landmark Theatres ("Landmark") brings this action for damages and injunctive relief against Defendants Regal Entertainment Group; Regal Entertainment Holdings, Inc.; Regal Entertainment Holdings II, LLC; Regal Cinemas Corporation; Regal Cinemas Holdings, Inc.; Regal Cinemas, Inc.; Regal Cinemas II, LLC; and Regal Gallery Place LLC (together, "Regal" or "Defendants") pursuant to federal and District of Columbia antitrust laws and tortious interference law and, on information and belief, and demanding trial by jury, complains and alleges as follows.

### NATURE OF THE ACTION

2.      Landmark brings this action to obtain compensatory, treble, and punitive damages; injunctive relief; the costs of suit, including a reasonable attorney's fee; and other relief for violations of federal and District of Columbia law by Regal in the licensing of desirable, commercial, "first run," feature-length motion pictures for theatrical exhibition to the public ("commercial films" or "mainstream films") in the District of Columbia. Regal has used its national circuit power, its dominant presence in the greater D.C. area, and its monopoly power

in the relevant markets to coerce film distributors to deprive Landmark, its competitor in the relevant markets, of fair competitive access to commercial films to exhibit to the public at its competing theater, all as a means of perpetuating and enlarging its circuit power and monopoly power in the relevant markets and of insulating itself from competition on the merits. This illegal conduct has deprived the public in the relevant markets of choice with respect to the theaters in which they see commercial films and the commercial films they see in their favored theaters, has reduced output, increased prices, and reduced the overall quality of commercial film exhibition offered to the public, has severely damaged competition in licensing and exhibition of films, has damaged Landmark's business and property, and is likely to continue unless enjoined by the Court.

## JURISDICTION AND VENUE

3.          This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367, and 15 U.S.C. §§ 4 and 15(a). Landmark alleges violations of the Sherman Antitrust Act over which this Court has jurisdiction under 15 U.S.C. §§ 4 and 15 and 28 U.S.C. § 1337(a). This Court also has federal question jurisdiction over Landmark's federal antitrust claims under 28 U.S.C. § 1331. The licensing and exhibition of films is a commercial activity that substantially affects, and is in the flow of, interstate trade and commerce. Regal's activities in purchasing equipment, services, and supplies as well as licensing films for its theaters substantially affect interstate commerce. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Landmark's claims under District of Columbia law.

4.          This Court has personal jurisdiction over Defendants because they have, either directly or through their named related companies, purposefully availed themselves of the benefits and protections offered by the District of Columbia by conducting business in this District and have committed tortious acts within this District, and their conduct in and contacts with this District give rise to the causes of action alleged herein.

5.          Venue is proper in this Court under 28 U.S.C. § 1391(b), as this District is the district in which a substantial part of the events giving rise to the claims occurred; and under 15

U.S.C. § 22, as Defendants, either directly or through their named related companies, transact business in this District.

## PARTIES

6.　　　　Plaintiff Silver Cinemas Acquisition Co. dba Landmark Theatres is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Los Angeles, California.

7.　　　　Landmark is recognized as a leader in the motion picture exhibition industry for providing its customers consistently diverse and entertaining films in a sophisticated, adult-oriented atmosphere. Since its founding in 1974, Landmark has grown to 55 theaters, 267 screens in 25 markets. Landmark's theaters showcase a wide variety of films, ranging from independent, art, and foreign content ("specialty films") to commercial or mainstream films. Landmark provides filmgoers with numerous amenities, including digital projection, a selection of gourmet concession items, in-theater sales of DVDs, books and CDs, and top-rated customer service.

8.　　　　Defendant Regal Entertainment Group is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Knoxville, Tennessee.

9.　　　　Defendant Regal Entertainment Holdings, Inc., is a subsidiary of Defendant Regal Entertainment Group and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Knoxville, Tennessee.

10.　　　　Defendant Regal Entertainment Holdings II, LLC, is a subsidiary of Defendant Regal Entertainment Group and is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Knoxville, Tennessee.

11.　　　　Defendant Regal Cinemas Corporation is a subsidiary of Defendant Regal Entertainment Holdings, Inc. and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Knoxville, Tennessee.

12.      Defendant Regal Cinemas Holdings, Inc. is a subsidiary of Defendant Regal Entertainment Group and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Knoxville, Tennessee.

13.      Defendant Regal Cinemas, Inc. is a subsidiary of Defendant Regal Cinemas Corporation and is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Knoxville, Tennessee.

14.      Defendant Regal Cinemas II, LLC, is a subsidiary of Defendant Regal Entertainment Group and is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Knoxville, Tennessee.

15.      Defendant Regal Gallery Place LLC is a subsidiary of Regal Entertainment Group and is a corporation organized and existing under the laws of the District of Columbia, with its principal place of business in Knoxville, Tennessee.

16.      Regal is the largest movie theater circuit in the United States, with approximately 7,631 screens in 575 theaters across the country. Regal operates a substantial number of theaters across the United States in non-competitive markets—that is, markets in which Regal by virtue of location faces virtually no competition in the markets for (1) exhibiting commercial films to the public and (2) licensing commercial films from distributors for exhibition to the public. Regal also has high market shares in major metropolitan areas throughout the United States. In addition, Regal has a substantial presence in the greater Washington, D.C. (Hagerstown) designated market area ("DMA"),[1] with a total of 24 theaters in that DMA. Regal derives substantial power from its large circuit size, high market shares, large number of theaters in non-competitive markets, and large number of theaters in the greater Washington, D.C. area.

## BACKGROUND, DEFINITIONS, AND INDUSTRY STRUCTURE

17.      Theatrical exhibition of films provides a major source of out-of-home entertainment in the United States.

---

[1]      A DMA is a region where the population can receive the same (or similar) television and radio station offerings, and may also include other types of media including newspapers and Internet content.

129580922.1

18.      Viewing films in theaters is a popular pastime. Total United States box office revenues or "grosses" in 2014 exceeded $10 billion.

19.      "Exhibitors" are persons or companies that operate one or more movie theaters in which films are exhibited or shown to the public. Many movie theaters have multiple screens, each of which is located in its own auditorium, thereby allowing more than one film to be exhibited in the theater at the same time. Such theaters are known as multiplexes, megaplexes, or theater complexes. The most important driver of the economic success of an exhibitor is fair competitive access to films.

20.      "Distributors" are companies that arrange for the marketing, promotion, and licensing of films for exhibition to the public in movie theaters throughout the United States and the world. The geographic focus of this litigation is the United States.

21.      The distribution level of the film industry in the United States is highly concentrated, with film distribution rights generating the vast majority of box office revenues being controlled by a small number of distributors. The seven "major" film distributors are 20th Century Fox, Disney, Warner Bros. Pictures, Sony Pictures Releasing Corporation, Universal Pictures, Paramount Pictures, and Lionsgate Films. Films distributed by the major film distributors account for approximately 90% of the total national box office gross. In 2014, films distributed by the major film distributors accounted for approximately 91% of Regal's circuit-wide box office grosses.

22.      Before a film is released, distributors engage in extensive research, audience tracking, and sophisticated modeling to estimate its likely range of revenues in order to, among other things, determine promotional and advertising budgets. Thus, well before a film is licensed to exhibitors, distributors have a well-informed expectation as to its likely revenues.

23.      "First run" when used in connection with motion pictures means the number of weeks immediately following the release date of a motion picture for which an exhibitor has licensed a new film.

24.     "Blockbuster" hits aside, a modern motion picture's theatrical exhibition life generally is no more than a few weeks (rarely more than four to five). About 90–120 days after the end of a film's first run, it is generally released in other viewing formats (e.g., DVD, pay-per-view television, streaming).

25.     For this reason, a film's first run typically is its only theatrical run, except for a limited number of films that will be licensed for a second run or "sub run" in certain markets at discounted admission prices.

26.     An exhibitor who cannot obtain license rights to a film for first run likely will never have access to the film, or will have access to it only after its theatrical exhibition value has been virtually exhausted.

27.     Commercial films are a unique form of entertainment. The experience of viewing a film in a theater differs from live entertainment (e.g., a stage production), a sporting event, or viewing a movie in the home (e.g., on a DVD or via pay-per-view or streaming).

28.     Home viewing of movies is not a reasonable substitute for viewing commercial films in a theater. When consumers watch movies in their homes, they typically lose several advantages of the theater experience, including the size of screen, the sophistication of sound systems, the opportunity to watch in 3-D, the social experience of viewing a film with other patrons, and a variety of food and beverage options. Additionally, the most popular, first run films are not available for some period of time for home viewing. Although renting or streaming a movie for home viewing is usually significantly less expensive than viewing a first run film in a theater, consumers, in the face of a small but significant, non-transitory increase in the price of viewing commercial films in a theater, would not substitute home viewing for viewing commercial films in a theater.

29.     Live entertainment and sporting events are not reasonable substitutes for viewing commercial films in a theater. Tickets for most forms of live entertainment and sporting events typically are significantly more expensive than commercial film exhibition tickets, and the content offered (e.g., sports games, stand-up comedy, live music) varies substantially from the

theatrical exhibition of film. In the face of a small but significant, non-transitory increase in the price of viewing commercial films in a theater, consumers would not substitute live entertainment and sporting events for viewing commercial films in a theater.

30.    First run films do not compete significantly with "sub run" films that are exhibited after the first run has ended. Tickets for commercial films usually cost significantly more than tickets for sub run films. Sub run films are no longer new releases, and movie-goers generally do not regard sub run films as adequate substitutes for first run films.

31.    Commercial films generally do not compete significantly with independent, art, or foreign ("specialty") films. Commercial films typically appeal to different patrons than specialty films. For example, art films tend to appeal more universally to older audiences. In addition, typically, specialty films are released less widely than commercial films and are not intended to appeal to as wide of an audience as commercial films. Because of these differences, movie-goers generally do not regard specialty films as adequate substitutes for commercial films.

32.    A "clearance" is an exclusivity agreement, express or implied, between a favored exhibitor and a distributor under which the distributor agrees that it will not license a film to play or run at the same time (sometimes referred to as "day and date" play) with any other theater in a relevant market or film licensing zone.

33.    In the past, a primary justification for commercial film clearances was the expectation that the licensed exhibitor would pay for substantial extra promotion or advertising of a film in its market if it had "clearance" over a competing exhibitor in the same market, to prevent the competitor from "free-riding" on the licensed exhibitor's advertising expenditures. Presently such substantial promotional expenditures by exhibitors are rare; distributors take substantially all responsibility for, and incur virtually all costs associated with, advertising their films.

34.    Commercial film clearances also used to be justified by the substantial cost of producing and distributing film reels: A distributor could achieve substantial savings by limiting the "prints" it created and shipped to exhibitors by concentrating the movie-going public in any

given town in a limited number of theaters. Digital distribution of film has substantially lowered the marginal cost to a distributor of distributing films and has thus obviated this justification for clearances.

35.        Indeed, most distributors have adopted a "wide release" strategy for the majority of their commercial films, whereby they try to earn as much revenue as possible in the first several weeks after release by showing the film on as many screens and in as many theaters as possible. Release date "theater count" (the number of theaters at which a film is exhibited on the date of its release) and national opening weekend box office gross have become important measures of a commercial film's success from the distributors' and public's perspective.

36.        Dominant exhibitor circuits like Regal derive substantial market power from their ability to provide a very large number of theaters and screens to distributors for the wide release of a film, including locations in non-competitive markets where a distributor has no other alternative exhibitor to play a film.

37.        "Circuit deals" are agreements or understandings, express or implied, whereby dominant exhibitor circuits use their circuit and market power to obtain, among other preferential film licensing treatment, clearance agreements that exclude other exhibitors from playing first run films, despite the fact that such clearance agreements are not in the independent economic best interest of the distributors coerced or induced to grant such clearances.

38.        Circuit deals have long been illegal under antitrust law as set forth, *inter alia*, by the United States Supreme Court decisions in *United States v. Griffith*, 334 U.S. 100 (1948), and *United States v. Crescent Amusement Co.*, 323 U.S. 173 (1944), and violate the antitrust requirement that films be licensed on a theater by theater, film by film basis, as set forth in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948).

### THE COMPETING THEATERS

39.        The Regal Gallery Place Stadium 14 ("Gallery Place") is a 14-screen, 3,350-seat theater located within the Gallery Place shopping complex, next to the MCI Center at Seventh

and H Streets in the Chinatown neighborhood of the District of Columbia. The theater is approximately one block from the Gallery Place Metro station.

40.     The Gallery Place opened in 2004 and has not been substantially renovated since. The typical consumer experience at the Gallery Place involves long ticket and concession lines, large, loud, and unpleasant crowds (including teens and children) that can destroy the movie-going experience, a virtually constant police presence, sold-out shows, exorbitantly priced concessions, ticket price surcharges/fees, bag searches, dirty bathrooms, and standard (non-plush/oversized) seating. For example, consumers report:

      a.     "Trying to see Gone Girl and Inside Out here, and multiple shows were sold out. Both times we had to get tickets 2 hours later."

      b.     "When seeing comedies, there tends to be a disproportionately huge number of annoyingly whooping, talking, and texting teens."

      c.     "This place needs some updating and after visiting another newer cinema with leather reclining seats, less people and no parking issues, I don't think I'll ever go back."

      d.     "[T]he theaters are super small, about half the size I'm used to [s]o you[']r[e] often stuck sitting right up next to the screen unless you get there early. The concession stand is also ridiculously slow."

      e.     "[T]he PEOPLE/movie-goers ruin the movie. Two out of three times, someone will be in there w[ith] their crying baby, loud kids shouting . . . or on the phone during the movie...especially on the weekend. I say avoid it if you can."

41.     Landmark's Atlantic Plumbing Cinema ("Atlantic Plumbing") is a new, six-screen, 344-seat theater located in the Shaw/Howard University neighborhood of the District of Columbia, a revitalized, up-and-coming area of the District. The theater is approximately four blocks from the Shaw-Howard and U St. / African-American Civil War Memorial / Cardozo Metro stations. Atlantic Plumbing seeks to show mainstream commercial first run films.

42.      Atlantic Plumbing opened on October 15, 2015. In addition to classic and alternative concessions, Atlantic Plumbing offers a full bar with premium food and alcoholic beverages, including specialty cocktails, a wide variety of beer and wine, and unique, upscale food options such as mini crab cakes and organic crispy chickpeas. Food and drinks purchased in the bar can be taken into any auditorium to enjoy while watching a movie. The theater also offers oversized, plush leather seats, advance reserved seating, and automated ticketing kiosks.

43.      The Regal Gallery Place's prices for reserved tickets are 10-44% higher than Landmark's Atlantic Plumbing's after "convenience fees" charged by Regal/Fandango are taken into account.[2] For example:

- A reserved seat for a non-discounted evening film, or late-afternoon film on Friday, Saturday, or Sunday, costs $13.00 at Landmark's Atlantic Plumbing and $14.35 (10% more) at Regal's Gallery Place.

- A reserved seat for a non-discounted late-morning or early-afternoon film costs $10.00 at Landmark's Atlantic Plumbing and $12.34 (23% more) at Regal's Gallery Place.

- A reserved seat for a non-discounted late-afternoon film on a weekday costs $10.00 at Landmark's Atlantic Plumbing and $14.35 (44% more) at Regal's Gallery Place.

44.      Ticket prices at the Gallery Place have increased by approximately 5% over the last two years, versus a cumulative inflation rate of approximately 2%.

## RELEVANT MARKETS

### Geographic Market

45.      The relevant geographic market is the "District Core." The District Core is comprised of the following neighborhoods in Northwest Washington, D.C. (north of the National

---

[2]      Consumers must use Fandango to purchase reserved seats at Regal's Gallery Place. Consumers may purchase reserved seats at Landmark's Atlantic Plumbing theater directly on Landmark's website, thus avoiding the Fandango "convenience fee."

Mall and west of North Capitol Street) roughly bounded on the west by Rock Creek/Rock Creek Park: Federal Triangle, Downtown, Chinatown, Mount Vernon Square, Logan Circle/Shaw, Truxton Circle, Scott Circle, Connecticut Ave./K Street, Foggy Bottom, West End, Dupont Circle, Kalorama Heights, Cardozo/Shaw, Shaw, Westminster, Le Droit Park, Adams Morgan, Lanier Heights, and Columbia Heights. The District Core is densely populated.

46.      The District Core includes the following Metro stations: Archives-Navy Memorial-Penn Quarter, Gallery Place-Chinatown, Mt. Vernon Square/7th St.-Convention Center, Shaw-Howard U, U. Street, Columbia Heights, Judiciary Square, Union Station, New York Ave-Florida Ave-Gallaudet U, Metro Center, Farragut North, Dupont Circle, Smithsonian, Federal Triangle, McPherson Square, Farragut West, and Foggy Bottom-GWU.

47.      Consumers in the District Core generally do not travel outside of this area to attend a theatrical film exhibition. Given a small but substantial, non-transitory increase in the prices charged by commercial film exhibitors in the District Core, District Core consumers would not travel farther afield to avoid the price increase.

48.      For example, if all of the commercial film exhibitors in the District Core raised their ticket prices by $1.00, consumers in the District Core generally would not travel to Georgetown, Arlington, Alexandria, Friendship Heights, Chevy Chase, Bethesda, or Tysons Corner to avoid the price increase, because the time and expense of traveling farther afield, and the discomfort and uncertainty associated with visiting unfamiliar neighborhoods, exceeds the hypothetical $1.00 price increase.

49.      Similarly, consumers outside of the District Core generally do not travel into the District Core to attend a theatrical film exhibition. Given a small but substantial, non-transitory increase in the prices charged by commercial film exhibitors in the markets outside of the District Core, consumers outside of the District Core would not travel into the District Core to avoid the price increase.

50.      For example, if all of the commercial film exhibitors in the area of Northwest Washington, D.C. northwest of Rock Creek/Rock Creek Park and Bethesda raised their ticket

prices by $1.00, consumers in that area generally would not travel into the District Core to avoid the price increase, because the time and expense of traveling farther afield, and the discomfort and uncertainty associated with visiting unfamiliar neighborhoods, exceeds the hypothetical $1.00 price increase.

51.     Washington, D.C. is a substantially Metro-dependent city. It costs approximately $2.00 to ride the Metro from Metro Center (in the heart of the District Core) to Courthouse near Arlington, and the ride takes approximately 10 minutes; it costs approximately $2.75 to ride the Metro from Metro Center to Bethesda, and the ride takes approximately 20 minutes.

52.     There is no Metro stop in Georgetown. The lack of a Georgetown Metro station therefore renders Georgetown particularly inaccessible to District Core residents.

53.     Washington, D.C. is also one of the most densely populated cities in the United States, which leads to major traffic congestion, especially during peak movie-going times. For example, during peak movie-going times, it takes approximately 15 to 30 minutes to travel by car from Metro Center to Courthouse near Arlington; 15 to 30 minutes to travel by car from Metro Center to Georgetown; and one-half hour to an hour to travel by car from Metro Center to Bethesda.

54.     The fact that Regal does not demand blanket clearance or refuse to play day and date with theaters outside of the District Core (in contrast to its treatment of Landmark's Atlantic Plumbing theater in the District Core, as alleged in further detail below) is further evidence that the District Core is its own separate market. For example, Regal's Gallery Place plays the same films on the same days and approximately the same times ("day and date") as AMC's Loews Georgetown 14, AMC's Courthouse Plaza 8 near Arlington, AMC's Uptown 1 in Cleveland Park, AMC's Mazza Gallerie in Friendship Heights, Arclight's North Bethesda theater, and Regal's own Bethesda theater. By contrast, Regal has demanded blanket clearance over and refused to play day and date with Landmark's Atlantic Plumbing theater. This pattern reflects Regal's estimation that Landmark's Atlantic Plumbing theater is in competition with it for many

- 12 -

of the same patrons, but that theaters in Georgetown, Arlington, Cleveland Park, Friendship Heights, and Bethesda are not.

### Product Markets

55.     The relevant product markets are the markets for licensing and exhibiting desirable first run commercial films ("commercial films") in the District Core. Regal's Gallery Place and Landmark's Atlantic Plumbing theater are the only exhibitors competing to (1) license commercial films from distributors for exhibition to the film-going public in the District Core and (2) exhibit commercial films to the movie-going public in the District Core.

56.     One indication of an exhibitor's market power is the percentage of seats in that market that it controls. For example, if an exhibitor controls 100% of the seats in a market, it is the only exhibitor bidding for film licenses and exhibiting films to the public and so by this measure has a 100% market share.

57.     By this measure, Regal, with ownership or control of 3,350 of the 3,684 total commercial film seats in the District Core, controls 91% of the market for commercial film licensing and exhibition in that market.[3]

58.     By virtue of, inter alia, its high market share, substantial presence in the greater D.C. DMA, and its circuit power, Regal has market—indeed, monopoly—power in the markets for licensing and exhibiting commercial films in the District Core.

59.     The high barriers to entry into the relevant markets reinforce Regal's market power. Attractive real estate opportunities for theaters in major metropolitan areas, including Washington, D.C., are scarce. Regal's blanket clearances, as alleged *infra*, serve as an additional barrier to entry into the markets because investors have difficulty obtaining financing for theaters that are likely to be restricted by such clearances.

---

[3]     Even if Arlington were included in the relevant geographic market, Regal would have an 88% share, with 10,000 of the 11,344 total commercial seats.

60.     Regal's monopoly power is further evidenced by its ability to raise prices above the rate of inflation and those charged by competing theaters of higher quality, while not losing customers.

61.     Regal's monopoly power is further evidenced by its ability to force distributors to exclude Landmark's Atlantic Plumbing theater from the markets, as detailed below.

## ANTICOMPETITIVE CONDUCT AND EFFECTS

62.     Regal recently stated in its latest Annual Report: "We are the largest domestic motion picture exhibitor operating 7,367 screens in 574 theaters in 42 states along with Guam, Saipan, American Samoa and the District of Columbia. . . . [T]he . . . size of our theater circuit is a significant . . . advantage for negotiating" with suppliers, including distributors.

63.     As detailed below, Regal is in fact using its national circuit power, its dominant presence in the greater D.C. DMA, and its monopoly power in the District Core to coerce distributors into denying Landmark's competing Atlantic Plumbing theater fair competitive access to commercial film so as to prevent Landmark's Atlantic Plumbing theater from earning the revenues needed to survive and expand, drive it out of business, and foreclose competition.

64.     Regal's Gallery Place opened in 2004, approximately one mile away from the Union Station 9.

65.     The Union Station 9 was opened in 1988 by AMC, the second largest movie theater circuit in the United States, was spun off to Phoenix Theatres in 2005, and closed in October 2009.

66.     Throughout the time that Regal's Gallery Place and the Union Station 9 coexisted, the two theaters played day and date with each other, i.e., Regal's Gallery Place did not assert clearance over the Union Station 9, and the Union Station 9 did not assert clearance over Regal's Gallery Place.

67.     In October 2015, Landmark opened its new Atlantic Plumbing theater. Landmark contacted each of the major distributors to inform them that Atlantic Plumbing would be seeking to license and exhibit predominantly commercial films. Each and every one of them responded

that Regal's Gallery Place was asserting a blanket clearance over—i.e., was refusing to play any commercial films day and date with—Landmark's Atlantic Plumbing theater.

68.     Regal's message to the distributors was clear: If you license a commercial film to Landmark's Atlantic Plumbing theater, Regal can and will use its monopoly power in the District Core, its dominance in the greater D.C. DMA, and its national circuit power, to retaliate against you, both by denying your film its full grossing potential in the District Core by not playing it at the Gallery Place, and by reserving the right to disadvantage your film's prospects at any of Regal's 575 theaters across the country.

69.     For example, Landmark sought to license *Burnt* from The Weinstein Company (opening weekend national gross of $5,002,521), *Our Brand Is Crisis* from Warner Bros. (opening weekend national gross of $3,238,433), *The Hunger Games: Mockingjay, Part 2* from Lionsgate (opening weekend national gross of $102,665,981), *Spectre* (the new James Bond movie) from Sony (opening weekend national gross of $70,403,148), and *Star Wars: The Force Awakens* from Disney (opening weekend national gross of $247,966,675).

70.     In all of these cases, the distributor refused to license the film to Landmark's Atlantic Plumbing theater because Regal's Gallery Place had demanded an exclusive license for the film and had informed the distributor that it would not play the film at its Gallery Place theater if the film were licensed to Landmark's Atlantic Plumbing theater. The distributors refused to license these films to Landmark's Atlantic Plumbing theater, and agreed to license them exclusively to Regal's Gallery Place, because they could not afford to lose Gallery Place's gross for these films and could not risk upsetting a dominant exhibitor like Regal with such leverage over them by virtue of its circuit power, dominant presence in the greater D.C. DMA, and monopoly power in the District Core.

71.     In the few instances in which Landmark's Atlantic Plumbing has been licensed a commercial film by a distributor, Regal has made good on its threat to deprive the distributor of its film's grossing potential in the District Core by refusing to play the film at the Gallery Place in retaliation for not licensing the film exclusively to the Gallery Place. This occurred in the case

- 15 -

of *Steve Jobs* (Universal), *Love the Coopers* (Lionsgate), and *Miss You Already* (Roadside Attractions).

72.     The few commercial films that have been licensed to Landmark's Atlantic Plumbing theater are generally much less desirable and in-demand than the films that have been licensed exclusively to the Gallery Place. For example, while Lionsgate licensed *Love the Coopers* to Landmark's Atlantic Plumbing theater, it licensed *The Hunger Games: Mockingjay, Part 2* exclusively to the Gallery Place. *Love the Coopers* grossed $8,317,545 nationally in its opening weekend; *The Hunger Games: Mockingjay, Part 2* grossed $102,665,981. *Miss You Already* grossed $552,506 nationally in its opening weekend.

73.     The film distributors' general refusal to offer fair competitive access to commercial films to Landmark's Atlantic Plumbing theater results entirely from Regal's exclusionary demands backed by its national circuit power, its monopoly power in the District Core, and its dominance in the greater D.C. DMA. It has nothing to do with the distributors' assessment of the quality and customer-drawing capacity of Landmark's Atlantic Plumbing theater.

74.     Indeed, day and date play has become common in the commercial film industry; distributors routinely grant licenses to Regal to play commercial films day and date with its own theaters and theaters of other dominant exhibitors (such as AMC's now-closed Union Station 9). Absent Regal's anticompetitive and predatory conduct, it would be in the distributors' best economic interests to license commercial films day and date to Regal's Gallery Place and to Landmark's Atlantic Plumbing theater.

75.     To survive economically, a commercial film exhibitor needs fair competitive access to commercial films. Regal's demands for preferential treatment/clearance/exclusivity in the District Core have the effect of denying Landmark the revenue it needs to continue to operate its Atlantic Plumbing theater.

76.     Regal's demands for preferential treatment/clearance/exclusivity have the effect of limiting District Core movie-goers' theater choices: they force District Core movie-goers to

129580922.1

see films at Regal's Gallery Place theater, which to many movie-goers is a substantially less desirable theater than Landmark's Atlantic Plumbing theater, or else not see them at all, thus depriving the public of freedom of choice as to where to view commercial films and/or the commercial films they can see in their favored theater.

77.      Regal's demands for preferential treatment/clearance/exclusivity have the effect of lowering overall commercial film exhibition output and quality, and raising commercial film exhibition prices, in the District Core.

78.      Landmark's Atlantic Plumbing theater offers a higher-quality movie-going experience at a lower price than Regal's Gallery Place, and the Gallery Place often sells out at peak movie-going times and in many respects is a less desirable movie theater venue. Therefore, for every commercial film license of which Landmark's Atlantic Plumbing theater is deprived, consumers in the District Core are made worse off: Some are prevented from seeing the film at all because it sells out at the Gallery Place and is not available at Landmark's Atlantic Plumbing theater, and those who do buy a ticket to the Gallery Place pay a higher price and suffer a lower-quality movie-going experience.

79.      If Regal could not leverage its monopoly power in the District Core, dominant presence in the greater D.C. DMA, and national circuit power to exclude Landmark's Atlantic Plumbing theater from the market, Landmark's theater would exert a competitive constraint on Regal, forcing it to lower its prices or increase its quality for the benefit of consumers. And consumers would have the choice of viewing commercial films at Landmark's Atlantic Plumbing theater or Regal's Gallery Place.

80.      By enforcing clearances that damage Landmark's relationships with distributors, Regal makes it even easier for itself to enforce clearances the next time around, leading to an anticompetitive feedback loop whose theoretical resting point is the closure of Landmark's Atlantic Plumbing theater.

129580922.1

81.     Regal's blanket clearance demands and agreements, and its threatened and actual retaliation against distributors who do not give Regal exclusivity, are anticompetitive in intent, design, and effects, and have no procompetitive intent, design, or effects.

82.     The blanket clearances are not justified by the close proximity of Landmark's Atlantic Plumbing theater to Regal's Gallery Place. Regal did not assert clearance over AMC's Union Station 9, which was closer to Regal's Gallery Place than Atlantic Plumbing is. Any reference by Regal to the close proximity of Landmark's Atlantic Plumbing theater is thus a pretext.

83.     The blanket clearances are not justified by the inability of the market to support more than one theater playing mainstream, commercial films. To the contrary, distributors would prefer to release their commercial films in the District Core more widely to reach a greater audience than can be reached by playing films only at the Gallery Place, and to bolster their total box office gross—particularly their opening weekend box office gross, an important measure and determinant of a film's success. Indeed, the Gallery Place often sells out of peak show times.

84.     In addition, while Landmark's and Regal's District Core theaters' patronage overlaps to some extent, Landmark's Atlantic Plumbing theater generally appeals to a more mature audience seeking a more refined movie theater experience. The high population density in the District Core, combined with the variability in consumer preference, can without question support two theaters playing mainstream films in the market.

85.     The blanket clearances are not justified by the need to prevent Landmark from "free riding" on any film-specific promotions or advertising undertaken by Regal. To the contrary, because the distributors take responsibility for marketing their commercial films, Regal engages in virtually no film-specific advertising. Thus there is no procompetitive justification for awarding Regal exclusivity.

86.     The blanket clearances are not justified by the need to limit film printing costs. Digital film distribution has substantially reduced the marginal cost of distributing film to an additional theater. Thus, with respect to commercial films, there are no meaningful distributional

- 18 -

economies from concentrating movie-goers in a limited number of theaters to save film print cost.

87.     The blanket clearances do not increase choice by forcing Landmark's Atlantic Plumbing theater to show different films from those playing at Regal's Gallery Place. Sub run, specialty, and other non-commercial films are not an adequate substitute for first run commercial films. Thus, forcing Landmark's Atlantic Plumbing theater to show non-commercial films does not increase choices offered to consumers in the market for first run, commercial film; to the contrary, it reduces their choices.

88.     Indeed, distributors space their commercial film release dates out so that generally no two major new releases are competing for patronage at the same time. The grant of exclusive licenses for the majority of commercial first run films to Regal's Gallery Place leaves Landmark's Atlantic Plumbing theater with few to no commercial films to exhibit.

89.     Regal's blanket commercial film clearances deprive Landmark's Atlantic Plumbing theater of the vital inputs it needs to stay in business. As Regal itself stated in its most recent Annual Report, "Movie-goers . . . usually choose a theater based [in part] on . . . *the films showing there*"; and therefore a theater's "ability to operate successfully depends upon . . . [its] ability to license motion pictures" (emphasis added). Landmark's Atlantic Plumbing theater is threatened with going out of business if Regal is not enjoined from its anticompetitive and exclusionary conduct. The public will then be left with *less* choice—not more.

90.     Landmark's injury flows from the anticompetitive and exclusionary aspect of Regal's conduct, which has also harmed the consuming public. Regal's blanket clearances and exclusivity demands have prevented Landmark from competing with Regal for film licenses and District Core patrons. The lack of competition not only has reduced choice, output, and quality and increased prices in the market; it has also prevented Landmark from winning business away from Regal through the normal competitive process with its superior and lower-priced offerings. Landmark has thus suffered antitrust injury.

91.     Regal's clearance demands have injured, and will continue to injure, Landmark and the consuming public unless enjoined.

## DAMAGES AND CONTINUING INJURY TO LANDMARK

92.     Regal has engaged in a continuing and continuous course of conduct with respect to the acts, practices, and conduct in violation of United States and District of Columbia law alleged herein that has injured competition and Landmark in an amount to be proven at trial and has caused and will continue to cause injury to competition, consumers, the public interest, and the business and property of Landmark unless permanently enjoined.

93.     Landmark will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Regal from its unlawful conduct and continuing violations of the antitrust laws.

## CAUSES OF ACTION

### COUNT I
### CIRCUIT DEALING
### PER SE VIOLATION OF SHERMAN ACT SECTION 1 AND/OR 2 AND
### D.C. CODE SECTION 28-4502 AND/OR 28-4503

94.     Landmark re-alleges the allegations contained in paragraphs 1 through 93 above.

95.     As the largest theater circuit in the United States, Regal possesses substantial circuit power.

96.     Regal's anticompetitive conduct described above, which continues today, is done with the predatory intent to deprive Landmark's Atlantic Plumbing theater of an opportunity to obtain the supply of films needed for effective competition and constitutes per se unlawful circuit dealing in violation of Sections 1 and/or 2 of the Sherman Act, 15 U.S.C. §§ 1 and/or 2, D.C. Code §§ 28-4502 and/or 28-4503, and the long-established rule of law that films be licensed on a film by film, theater by theater basis without the discriminatory preferences in favor of one or more dominant theater circuits.

97.     Like the formula deals and master agreements declared unlawful in *Paramount*, Regal's policy and practice of using and threatening to use its circuit power to enforce clearances

against Landmark substantially restrain competition by "eliminat[ing] the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit" and "are, therefore, devices for stifling competition and diverting the cream of the business to the large operators." 334 U.S. at 154.

98.        As a direct and proximate result of the per se unlawful conduct of Regal in furtherance of the violations alleged, Landmark has been injured in its business and property by being foreclosed from fair competitive access to markets for film licenses and exhibition in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15 and D.C. Code § 28-4508(a).

99.        Landmark also is entitled to recover from Regal the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15 and D.C. Code § 28-4508(a).

100.        Landmark will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Regal from its unlawful conduct and continuing violations of the antitrust laws. Landmark is thus entitled to injunctive relief against Regal.

## COUNT II
## AGREEMENTS IN RESTRAINT OF TRADE
## VIOLATION OF SHERMAN ACT SECTION 1 AND D.C. CODE SECTION 28-4502
## (RULE OF REASON)

101.        Landmark re-alleges the allegations contained in paragraphs 1 through 93 above.

102.        Regal possesses monopoly power in the markets for commercial film licenses and theater customers in the District Core, as demonstrated by Regal's high market shares in those markets, its dominance in the greater-D.C. DMA, and its national circuit power, its actual exclusion of competition and control over distributors, its ability to raise prices and suppress quality without losing customers, and the high barriers to entry into those markets.

103.        Regal has used its market power to coerce distributors into entering into agreements with Regal pursuant to which those distributors agree to deny Landmark the opportunity to compete with Regal for film licenses and theater customers.

- 21 -

104.     By such acts, practices, and conduct, Regal has directly insulated itself from and foreclosed competition with Landmark for film licenses and theater customers in the District Core, and has substantially and unreasonably restrained competition in the relevant markets.

105.     Regal's conduct in entering into these contracts, combinations, or conspiracies has no pro-competitive benefit or justification. The anticompetitive effects of these agreements outweigh any purported pro-competitive justifications. The public has been deprived of the freedom to choose where to view films and has been forced to accept lower output, higher prices, and reduced quality versus what they would be offered in a market uninhibited by Regal's anticompetitive conduct.

106.     By its acts, practices, and conduct, including by entering into the agreements described above, and which continue today, Regal has entered into contracts, combinations, or conspiracies in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and D.C. Code § 28-4502.

107.     As a direct and proximate result of the unlawful conduct of Regal in furtherance of the violations alleged, Landmark has been injured in its business and property by being foreclosed from fair competitive access to markets for film licenses and exhibition in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15 and D.C. Code § 28-4508(a).

108.     Landmark also is entitled to recover from Regal the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15 and D.C. Code § 28-4508(a).

109.     Landmark will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Regal from its unlawful conduct and continuing violations of the antitrust laws. Landmark is thus entitled to injunctive relief against Regal.

### COUNT III
### MONOPOLIZATION
### VIOLATION OF SHERMAN ACT SECTION 2 AND D.C. CODE SECTION 28-4503

110.     Landmark re-alleges the allegations contained in paragraphs 1 through 93 above.

111.     Regal possesses monopoly power in the markets for commercial film licenses and movie theater customers in the District Core, as demonstrated by Regal's high market shares in those markets, its dominance in the greater-D.C. DMA, and national circuit power, its actual exclusion of competition and control over distributors, its ability to raise prices and suppress quality without losing customers, and the high barriers to entry into those markets.

112.     Regal has used its monopoly power to coerce distributors into denying Landmark the opportunity to compete fairly with Regal for film licenses and theater customers in the District Core, thereby having a direct adverse effect on competition in those markets by preventing Landmark from competing with Regal on the merits.

113.     By such acts, practices, and conduct, Regal has directly insulated itself from competition with Landmark for film licenses and theater customers in the District Core, and has thereby restrained trade in, and willfully maintained or expanded its monopoly power in, the District Core.

114.     Regal's conduct has no pro-competitive benefit or justification. The anticompetitive effects of its behavior outweigh any purported pro-competitive justifications. The public has been and continues to be deprived of the freedom to choose where to view films and has been forced to accept lower output, higher prices, and reduced quality versus what they would be offered in a market uninhibited by Regal's anticompetitive conduct.

115.     By its acts, practices, and conduct, which continues today, Regal has engaged in a course of conduct that constitutes monopolization and/or unlawful exercise of monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and D.C. Code § 28-4503.

116.     As a direct and proximate result of the unlawful conduct of Regal in furtherance of the violations alleged, Landmark has been injured in its business and property by being foreclosed from fair competitive access to markets for film licenses and exhibition in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15 and D.C. Code § 28-4508(a).

117.     Landmark also is entitled to recover from Regal the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15 and D.C. Code § 28-4508(a).

118.     Landmark will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Regal from its unlawful conduct and continuing violations of the antitrust laws. Landmark is thus entitled to injunctive relief against Regal.

### COUNT IV
### ATTEMPTED MONOPOLIZATION
### VIOLATION OF SHERMAN ACT SECTION 2 AND D.C. CODE SECTION 28-4503

119.     Landmark re-alleges the allegations contained in paragraphs 1 through 93 above.

120.     Through its anticompetitive conduct as alleged above, Regal specifically intended and intends to maintain and expand its monopoly power in the markets for commercial film licenses and exhibition in the District Core. As evidenced by Regal's high market shares in those markets, its circuit power, it abuse of market power, its ability to exclude or foreclose competition and control distributors, its ability to raise prices and suppress quality without losing customers, and the high barriers to entry into the relevant markets, Regal's anticompetitive scheme has had a direct adverse effect on competition and, at a minimum, has a dangerously high probability of success of achieving monopoly in the District Core.

121.     Regal's conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and D.C. Code § 28-4503.

122.     As a direct and proximate result of the unlawful conduct of Regal in furtherance of the violations alleged, Landmark has been injured in its business and property by being foreclosed from fair competitive access to markets for film licenses and exhibition in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15 and D.C. Code § 28-4508(a).

123.     Landmark also is entitled to recover from Regal the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15 and D.C. Code § 28-4508(a).

124.     Landmark will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Regal from its unlawful conduct and continuing violations of the antitrust laws. Landmark is thus entitled to injunctive relief against Regal.

## COUNT V
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

125.     Landmark re-alleges the allegations contained in paragraphs 1 through 93 above.

126.     Landmark enjoyed, enjoys, and expects to continue to enjoy business relationships with patrons of its Atlantic Plumbing theater. Those relationships provide economic benefits to Landmark from its ability to offer those patrons a wide variety of commercial films. At all relevant times herein, Regal had actual knowledge of these relationships and their economic benefits to Landmark.

127.     Landmark enjoyed, enjoys, and expects to continue to enjoy business relationships with commercial film distributors. Those relationships provide economic benefits to Landmark from fair competitive access to the licensing of those distributors' commercial films. At all relevant times herein, Regal had actual knowledge of these relationships and their future economic benefits to Landmark.

128.     Regal intentionally interfered with those relationships by inducing distributors not to enter into licensing agreements with Landmark for its Atlantic Plumbing theater and not to enter into or continue a business relationship with Landmark for that theater. This deprived Landmark of the ability to offer District Core patrons those distributors' commercial films.

129.     As a direct and proximate result of Regal's actions, Landmark has been injured and continues to suffer economic injury.

130.     Regal's actions are not justified or privileged.

131.     Regal has acted willfully, maliciously, oppressively, with full knowledge of the adverse effects of its actions on Landmark, with willful and deliberate disregard of the consequences to Landmark, and with specific intent. As such, Landmark seeks actual damages

129580922.1

(including Landmark's litigation costs and attorneys' fees) and exemplary and punitive damages in amounts to be proven at trial.

132.     Landmark will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Regal from its tortious conduct. Landmark is thus entitled to injunctive relief against Regal.

### PRAYER FOR RELIEF

WHEREFORE, Landmark requests that the Court enter judgment and grant relief as follows:

133.     Adjudge Regal to have violated and to be in continuing violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and D.C. Code §§ 28-4502 and 28-4503.

134.     Adjudge Regal to have committed and to be continuing to commit the tort of interference with business relations.

135.     Enter judgment for Landmark against Regal for three times the amount of damages sustained by Landmark, together with the expenses of litigation and cost of this action, including a reasonable attorney's fee, and such other relief as appropriate under 15 U.S.C. § 15 and D.C. Code § 28-4508.

136.     Pursuant to Federal Rule of Civil Procedure 65, enjoin Regal from engaging in further anticompetitive and unlawful conduct, including without limitation by enjoining Regal from, directly or indirectly, demanding or requesting exclusive film licenses or the right to exhibit films from any distributor at the Gallery Place to the exclusion of Landmark's Atlantic Plumbing theater, or indicating to a distributor that Regal will refuse to play a film at any of its theaters if the distributor licenses the film for exhibition at Landmark's Atlantic Plumbing theater, or carrying out such refusal.

137.     Grant such other equitable relief, including disgorgement of all unlawfully obtained profits that the Court finds just and proper to address and to prevent recurrence of Regal's unlawful conduct.

129580922.1

138.     Grant such other and further equitable or legal relief as the Court deems just and proper.

## JURY TRIAL DEMAND

139.     Pursuant to Federal Rule of Civil Procedure 38, Landmark hereby demands a jury trial as to all issues triable to the jury.

Dated January 26, 2016                    Respectfully submitted,

**PERKINS COIE** LLP

By: */s/ Barry J. Reingold*
Barry J. Reingold
D.C. Bar No. 942086
BReingold@perkinscoie.com
700 Thirteenth Street NW, Suite 600
Washington, DC, 20005-3960
Telephone: 202.654.6226
Facsimile: 202.654.9141

Thomas L. Boeder [*Pro Hac Vice*
   application pending]
TBoeder@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Catherine S. Simonsen [*Pro Hac Vice*
   application pending]
CSimonsen@perkinscoie.com
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.3332
Facsimile: 310.788.3399

Attorneys for Plaintiff Silver Cinemas
Acquisition Co. dba Landmark Theatres

129580922.1